IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KATIE LECOQ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:04-CV-0825-D |
| VS. | § | |
| | § | |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

<u>MEMORANDUM OPINION</u>

Plaintiff Katie LeCoq ("LeCoq") brings this action under § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application (as amended) for a closed period of disability and disability insurance benefits and supplemental security income benefits under titles II and XVI of the Act. Concluding that LeCoq has failed to demonstrate reversible error, the decision is AFFIRMED.

I

LeCoq was born in 1958 and applied for disability insurance benefits and supplemental security income benefits under titles II and XVI on November 3, 1994, contending she had been unable to engage in substantial gainful activity since August 3, 1993. LeCoq amended her application to seek a closed period of disability from August 3, 1993 until June 15, 1995, because her medical condition

improved while her case was pending.   She has a high school
education and 3½ years of college, which is defined as more than a
high school education.   Her relevant work history includes jobs as
a postal flat sorter and medical laboratory technician.   LeCoq
maintains that she was unable to work during the relevant time
period due, *inter alia*, to Post Traumatic Stress Disorder ("PTSD")
and tingling secondary to bilateral carpal tunnel syndrome
("BCTS").

The Administrative Law Judge ("ALJ") conducted a hearing in
1997 and denied her claim.   LeCoq sought review and in 2001 the
Appeals Council remanded for another hearing.   Following a second
hearing in 2002, the ALJ again denied her claim.   He found that her
impairments, although "disabling from August 1993 until October
1993, failed to meet the 12-month durational requirement[ ]" of the
Act.   R. 19.

The ALJ found that LeCoq "was able to sit, stand, and walk for
six hours [in] an eight-hour work day and lift and carry five
pounds frequently and [ten] pounds occasionally," *id.*, and that she
"was limited to work activity at the light exertional level[,]" *id.*
at 20.   He also found that her ability to perform the full range of
light work was compromised by pain due to BCTS and by an inability
to perform fine manipulation and repetitively use her hands.   The
ALJ concluded at step three that her severe depression, PTSD, and
BCTS did not meet or equal any of the listings in Appendix 1,

Subpart P, Regulation No. 4.  He found at step four that she could not perform her past relevant work, "which required repetitive fine manipulation and lifting 25 pounds frequently and 50 pounds occasionally."  *Id.*  The ALJ then shifted the burden to the Commissioner at step five to show that there were other jobs existing in significant numbers in the national economy that LeCoq could perform, consistent with her residual functional capacity ("RFC"), age, education, and work experience.  Using the Medical-Vocational Guidelines of Appendix 2, Subpart P, as a framework, and based on the testimony of the vocational expert ("VE"), the ALJ found that LeCoq could perform the occupations of cashier, ticket taker, and security guard, and that there were a significant number of these jobs in the national economy that she could have performed during the relevant period.  He therefore concluded that LeCoq was not disabled, within the meaning of the Act, for any period of 12 months during the period August 3, 1993 to June 15, 1995.

LeCoq sought review by the Appeals Council, which denied her request.  The ALJ's decision thus became the final decision of the Commissioner.  LeCoq now seeks judicial review.

## II

The court's review of the Commissioner's decision is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards to evaluate the evidence.  *Ripley v. Chater*, 67 F.3d 552, 555 (5th

Cir. 1995); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam).   "The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (footnote omitted).

"The court may not reweigh the evidence or try the issues de novo or substitute its judgment for that of the [Commissioner]." *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984).   "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive and the Commissioner's decision must be affirmed." *Martinez*, 64 F.3d at 173.   "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).   "It is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (citing *Moore v. Sullivan*, 919 F.2d 901, 904 (5th Cir. 1990) (per curiam)).   "To make a finding of 'no substantial evidence,' [the court] must conclude that there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983)).   Even if the court should determine that the evidence preponderates in the claimant's

- 4 -

favor, the court must still affirm the Commissioner's findings if there is substantial evidence to support these findings. *See Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985).  The resolution of conflicting evidence is for the Commissioner rather than this court. *See Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983) (per curiam).

For purposes of social security determinations, "disability" means an inability to engage in substantial gainful activity because of any medically determinable physical or mental impairment or combination of impairments that could be expected either to result in death or to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is disabled, the Commissioner uses a five-step sequential inquiry.  *Leggett*, 67 F.3d at 563; *Martinez*, 64 F.3d at 173-74. The Commissioner must consider whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in Appendix 1, Subpart P, Regulation No. 4; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work that exists in significant numbers in the national economy.  *Leggett*, 67 F.3d at 563 n.2; *Martinez*, 64 F.3d at 173-74; 20 C.F.R. § 404.1520 (2004). "The burden of proof is on the claimant for the first four steps,

but shifts to the [Commissioner] at step five." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam) (citing *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989) (per curiam)).  At step five, once the Commissioner demonstrates that other jobs are available to a claimant, the burden of proof shifts to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (per curiam).

When determining the propriety of a decision of "not disabled," this court's function is to ascertain whether the record considered as a whole contains substantial evidence that supports the final decision of the Commissioner, as trier of fact.  The court weighs four elements of proof to decide if there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) age, education, and work history. *Martinez*, 64 F.3d at 174 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam)).

"The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Ripley*, 67 F.3d at 557.  "If the ALJ does not satisfy [this] duty, [the] decision is not substantially justified." *Id.*  Reversal of the ALJ's decision is appropriate, however, "only if the applicant shows that [she] was prejudiced." *Id.*  The court will not overturn

- 6 -

a procedurally imperfect administrative ruling unless the substantive rights of a party have been prejudiced. *See Smith v. Chater*, 962 F. Supp. 980, 984 (N.D. Tex. 1997) (Fitzwater, J.).

### III

LeCoq contends the ALJ erroneously concluded that she did not suffer from a severe mental impairment during the relevant period where he misrepresented the medical expert ("ME") testimony on which he stated he was relying and ignored medical evidence that contradicted his findings. Under this more general assertion, she advances several contentions that the court considers below.[1]

### A

### 1

LeCoq argues that, even though the record clearly documents that she suffered from a mental impairment during the relevant period, the ALJ failed to identify any applicable mental listing and failed to perform his own analysis of the evidence. She

---

[1]In her reply brief, although LeCoq states that she "generally continues to stand on the arguments originally presented to this Court" and is taking the "opportunity to point out some significant flaws in Defendant's arguments[,]" P. Rep. Br. at 1, she raises new arguments in response to the Commissioner's contentions, *see, e.g., id.* at 2 (contending that the ALJ provided no legitimate reason why he concluded in his 1997 decision that the evidence demonstrated that she had a severe mental impairment but concluded in 2002 that the same evidence demonstrated that her mental impairment imposed only slight limitations). The court declines to consider any such new arguments and therefore does not address them. *See Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990) (Fitzwater, J.) (declining to consider party's argument raised for first time in reply brief).

maintains that where the medical evidence reveals the presence of a mental impairment affecting a claimant's ability to work, the Commissioner's own regulations dictate that the ALJ must follow the procedure set out in 20 C.F.R. § 404.1520a and the Listing of Impairments to evaluate the evidence of that impairment.  Instead, she contends the ALJ stated that he was accepting the testimony of Sol J. Freeman, M.D. ("Dr. Freeman"), the ME who was called to testify regarding LeCoq's physical impairments, who is not an expert in psychiatry or psychology.  She posits that, although Dr. Freeman did not testify regarding her mental impairments, the ALJ indicated that he testified that LeCoq had only slight restrictions of daily living, social functioning, concentration, and persistence and pace, and testified that she had experienced no episodes of decompensation.  LeCoq complains that the ALJ completely misrepresented the record because Dr. Freeman did not provide this testimony.

2

As a preliminary matter, the court holds that, despite LeCoq's reference to § 404.1520a and the Listing of Impairments, and her assertion that the ALJ failed to identify any applicable mental listing and perform his own analysis of the evidence, she has not presented any claim of error beyond the specific contention that the ALJ misrepresented the record.  She has not, for example, preserved a claim of error that the ALJ failed in some respect to

apply properly the "special technique" for analyzing mental impairments. *Cf. Frames ex rel. Rollins v. Barnhart*, No. 3:03-CV-0924-D, slip op. at 3, 6 (N.D. Tex. June 23) (plaintiff explicitly sought judicial review on ground that ALJ had failed to apply "special technique" for analyzing mental impairments under § 404.1520a), *appeal docketed*, No. 04-11028 (5th Cir. Aug. 30, 2004).[2] The court therefore turns to the argument that is properly before the court.[3]

3

The record reflects that Dr. Freeman testified about LeCoq's physical impairments as the ME at her 2002 hearing. As LeCoq points out, Dr. Freeman is not an expert in the fields of psychiatry and psychology. The ALJ did not, however, misrepresent Dr. Freeman's testimony. Preceding a paragraph in which the ALJ discussed evidence of LeCoq's physical impairments, the ALJ addressed evidence of her mental impairments. The second

---

[2]In her reply brief, LeCoq states that, after the Appeals Council remanded the case, the ALJ did not complete a new Psychiatric Review Technique Form and did not expressly make new Psychiatric Review Technique findings in the body of his 2002 decision. *See* P. Rep. Br. at 2. Although she does not further develop this statement as a distinct claim of error, to the extent she intends to do so, the court declines to consider it because it would be a new argument raised in her reply brief. *See supra* note 1.

[3]The court notes that, in accordance with Listing 12.04, the ALJ did appear to assess the degree of LeCoq's functional limitations under the "B" criteria. *See* R. 18; 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04(B) (2004).

paragraph——i.e., concerning physical impairments——began by stating, "[t]he medical expert further stated[.]"  R. 18.  LeCoq interprets this introductory phrase to mean that the ALJ was relying on the same ME who addressed physical limitations when he discussed mental limitations in the preceding paragraph.  *See* P. Rep. Br. at 5.  Considering the record as a whole and the ALJ's decision, however, it is clear that the evidence the ALJ discussed concerning LeCoq's mental impairments came not from Dr. Freeman, but from Alvin Smith, Ph.D. ("Dr. Smith"), who served as an ME at LeCoq's 1997 hearing and provided information concerning her mental impairments.  Dr. Smith's testimony is consistent with the ALJ's characterization of his testimony that, "while [LeCoq] was hospitalized . . . [she] was severely impaired due to major depression and [PTSD]," and confirms that it is he, not Dr. Freeman, who is the source of the findings. *Compare* R. 18 *with id.* 476-495.

The court recognizes that the ALJ did not explicitly identify Dr. Smith in his ruling.  Even if the court assumes *arguendo* that the ALJ's decision is somehow defective because it did not identity Dr. Smith as the source of the findings, the court reviews the ALJ's judgment, not his opinion.  *See Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) (stating "[t]he statute requires us to review the quality of the evidence . . . not the quality of the ALJ's literary skills.").  "The ALJs work under great burdens.  . . .  When they slow down to write better opinions, that holds up

the queue and prevents deserving people from receiving benefits."
*Id.* Had the ALJ identified the particular ME on whose testimony he
relied, the parties and the court might have found it easier to
eliminate a potential source of confusion, but it would not change
the substantive evidence on which the ALJ based his decision.
LeCoq has not demonstrated a basis to reverse the Commissioner.[4]

B

LeCoq maintains that the ALJ ignored or disregarded other
substantial evidence that was contrary to his findings.  She does
not make clear the standard under which she contends this court
must assess the claimed error, although she appears to contend at
the end of the relevant argument that the ALJ erred under
*Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986), by failing to

---

[4]In her reply brief, LeCoq posits that, even if the ALJ did
intend to refer to Dr. Smith's testimony, he misrepresented the
testimony.  *See* P. Rep. Br. at 5.  She reasons that Dr. Smith
provided no opinion regarding the "B" criteria that the ALJ
described as being based on the ME's testimony.  *See* 20 C.F.R. Pt.
404, Subpt. P, App. 1, Listing 12.04(B) (2004).  LeCoq asserts that
neither Dr. Smith nor Dr. Freeman testified that she had only
slight restrictions in general functioning and no episodes of
decompensation and that, regardless which physician the ALJ
referred to in his decision, he misrepresented the ME testimony
regarding the "B" criteria and, consequently, his decision is not
supported by substantial evidence.
    Contrary to LeCoq's argument, Dr. Smith did provide an opinion
that relates to her social functioning, which is one of the "B"
criteria.  *See* R. 480.  Additionally, to the extent LeCoq argues
that the ALJ identified the ME's testimony as the basis for his
findings on the "B" criteria, she engages in an incorrect reading
of his decision.  Nowhere did the ALJ state that his "B" criteria
findings were based on the ME's testimony.  In any case, LeCoq has
failed to show reversible error.

consider whether she could have sustained work activity on a regular basis. *See* P. Br. at 13.

Because LeCoq cites only *Singletary* and does not otherwise identify the legal standard under which she seeks review, the court, aside from considering whether there is *Singletary*-type error, will address her arguments under the settled principles that resolution of conflicting evidence is for the Commissioner, *see Patton*, 697 F.2d at 592, and that the court must affirm the Commissioner's findings if they are supported by substantial evidence, *see Carry*, 750 F.2d at 482.

1

LeCoq cites as examples of the ALJ's ignoring or disregarding other substantial evidence his finding that she did not suffer from a period of decompensation during the relevant time period, which she contends "is completely at odds with the record." P. Br. at 12. LeCoq states that, in September 1993, her treating physician specifically indicated that she was decompensating and recommended psychiatric care. She posits that, in October 1993, she had become incredibly despondent and was hospitalized for two weeks. She complains that, considering this evidence, the ALJ did not explain why he concluded that she had not experienced an episode of decompensation. LeCoq also contends that the reviewing agency physicians concluded that her mental impairment imposed moderate restrictions on her social functioning and limited her ability to

- 12 -

perform detailed tasks.   She also maintains that Dr. Smith testified that, although her mental impairment was not disabling throughout the entire period at issue, it was still severe after she left the hospital and would have placed limitations on her ability to function; that, while she could have followed simple instructions, she would have had difficulty with social functioning; and that she could have had only minimal and superficial contact with coworkers and supervisors and that public contact would have been precluded.   She contends that even the ALJ found in his first decision that she was restricted to work involving simple instructions.

LeCoq's arguments are deficient in several respects.   First, although LeCoq argues that the ALJ ignored or disregarded substantial evidence contrary to his findings, the court is unable to conclude from the ALJ's decision alone whether he did in fact ignore or disregard the evidence mentioned or whether he simply discounted it in the face of evidence that supported his findings. Second, although LeCoq appears to contend that the ALJ's findings conflict with evidence in the record, she fails to explain how this infected the consideration of her claim under the ALJ's application of the five step analysis called for by 20 C.F.R. § 404.1520.   For example, as previously mentioned, LeCoq argues that the ALJ's finding that she did not suffer from a period of decompensation during the relevant period conflicts with the record.   An erroneous

finding as to decompensation has potential relevance at steps three, four, and five. LeCoq does not specifically identify, however, which of these steps, if any, was impacted by the ALJ's purportedly erroneous finding. This same deficiency exists as to her argument regarding the reviewing agency physicians' conclusions and Dr. Smith's opinions regarding her limitations. LeCoq has also failed to show that she was prejudiced by the ALJ's findings and therefore has not demonstrated reversible error.

Even assuming the ALJ's finding that "there were no episodes of decompensation," R. 18, conflicts with the record and lacks substantial supporting evidence, LeCoq cannot show that the ALJ committed reversible error. The ALJ found that LeCoq had disabling impairments during the period August 1993 to October 1993 (which includes the September referral and the October period of despondence that LeCoq cites). R. 19. Dr. Smith opined that she met a 12.04 listing while she was in the hospital for two weeks in October 1993 with severe depression. R. 476-77, 479. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04 (2004). Nevertheless, he also testified that "she was discharged as less depressed, less labile and improved," that "there was no 12-month period . . . where her degree of impairment was at the level it was when she was hospitalized," and that "hospitalization was effective." R. 477, 479. Even if LeCoq was decompensating or despondent from August 1993 to October 1993, she has not shown that

she experienced additional episodes of decompensation thereafter. Accordingly, she has not demonstrated that her ability to work after this period would have been limited in any way due to decompensation and has thus failed to show that the ALJ committed reversible error.

LeCoq cites an assessment performed by agency physician T.C. McCormick, M.D. ("Dr. McCormick"), wherein he concluded that she had moderate difficulties in maintaining social functioning and was moderately limited in her ability to carry out detailed instructions. *See* R. 69, 80. Her citation to this evidence alone is inadequate to show either that the ALJ erred at step three in concluding that "[h]er impairments did not meet or medically equal" a listing, R. 20, or that he erred at step five in finding that "jobs existed in significant numbers in the national economy which claimant could have performed" during the relevant period. R. 21.

Over the course of the relevant period, LeCoq's functional limitations were assessed by agency physicians under listings 12.04, 12.06, and 12.08. R. 73, 80, 106, 113. To meet the requirements for these listings under the "B" criteria, a claimant must suffer from at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration[.]

- 15 -

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 12.04, 12.06, & 12.08 (2004). There is substantial evidence in the record to support the ALJ's findings that LeCoq only had slight limitations as to the first and third criteria. Two examining physicians who examined LeCoq during the relevant period reported little to no problems in these particular areas. *See* R. 351 (Steven Vobach, M.D.'s June 2, 1994 psychiatric report) (noting LeCoq's report that she could "bathe, dress and groom herself independently" and "cook meals and clean her residence when she [had] the energy" and observing that she could drive, could handle her own finances, and that her "concentration, persistence and pace were good."); R. 371-72 (Brian Espinoza, M.D.'s February 6, 1995 psychiatric report) (finding similarly). Moreover, even if the court assumes, as it did earlier, that LeCoq suffered one episode of decompensation, as the court has already indicated, LeCoq has not shown that she suffered from any other episodes of decompensation during the relevant period. Accordingly, she falls short of showing that she had repeated episodes of decompensation and fails to establish the fourth "B" criterion. Because she fails to show that the above three criteria were of the severity needed to meet the requirements of a listing under the "B" criteria, she would not have been able to meet the requirements of the listings under which her limitations were assessed, regardless what her capabilities were as to social functioning. Consequently, her citation to Dr.

- 16 -

McCormick's assessment fails to show that the ALJ committed reversible error at step three.

Moreover, although Dr. McCormick concluded that LeCoq was moderately limited in social functioning and her ability to perform detailed tasks, he did conclude that she "retain[ed] the ability to understand and follow simple instructions to adequately interact [with] co-workers and supervisors [and] to adapt to routine work environments." R. 71. Dr. Smith testified similarly. While acknowledging that LeCoq's impairment for depression was severe during the relevant period and that "she had some limitations in the area of social functioning," he testified that LeCoq would have been able to understand, remember, and carry out simple instructions and function in a routine work environment. R. 480. He also opined that she would have been able to relate to coworkers and accept supervision, albeit with some difficulty due to her propensity for anger and irritation.[5] R. 480-81. These observations are significant because, during the hearing that preceded his 2002 decision, the ALJ specifically restricted the potential jobs that LeCoq could perform to those in the unskilled occupational base. *See* R. 512. In his hypothetical to the VE, he explicitly recognized that LeCoq "had severe mental limitations affecting concentration, detailed work, and complex tasking, "but

---

[5]Although Dr. Smith also indicated that LeCoq would have been precluded from public contact, R. 481, the ALJ was entitled to conclude otherwise, as explained *infra*.

met the SSR-85.15 requirements for unskilled work, which are understand, remember, carry out simple instructions, relate to coworkers and supervision, [and] adapt to a routine work environment."[6] R. 512; *see also* SSR 85-15, 1985 WL 56857 (S.S.A.), at *4 (1985). Based on the unskilled jobs the VE identified in her testimony, *see* R. 512-14, the ALJ found that there were significant jobs in the national economy that LeCoq could perform. *See* R. 20. Although the ALJ does not explicitly state in his decision that he found that LeCoq was capable of doing unskilled work, this finding is implicit from his reliance on the VE's testimony. Drs. McCormick's and Smith's testimony provide substantial evidence for such a finding. Because the VE restricted the potential jobs LeCoq could perform based on this criterion, and the ALJ ultimately concluded that there were significant jobs in the national economy that LeCoq could perform based on the VE's testimony, LeCoq has failed to show that the ALJ committed reversible error at step

---

[6]In her brief, LeCoq appears to rely in support of her argument on the ALJ's finding in his 1997 decision that LeCoq did not have the RFC to perform work that required "understanding, remembering and carrying out more than simple job instructions." R. 48. Because the VE limited her analysis of jobs that LeCoq could perform to those in the unskilled job base, the ALJ's analysis at step five was consistent with the limitation he explicitly recognized in his earlier decision because unskilled work merely requires an individual to "understand, carry out, and remember simple instructions." SSR 85-15, 1985 WL 56857 (S.S.A.), at *4 (1985).

five.[7]

2

Nor has LeCoq demonstrated *Singletary*-type error. Her conclusory argument (consisting essentially of one sentence in her brief, *see* P. Br. at 13) is insufficient to establish that the ALJ was required to make a separate finding concerning her capability of sustained employment. *Cf. Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (per curiam) (on rehearing) (holding that plaintiff had failed to establish factual predicate required to necessitate separate finding).

C

LeCoq next argues that the ALJ's failure to properly consider her documented mental impairments created an underlying flaw that tainted the step five analysis. She maintains that the ALJ posed a hypothetical to the VE that included some mental restrictions but did not include the limitation regarding dealing with the public that Dr. Smith testified about. LeCoq also advances this contention, which is difficult to decipher: "the ALJ apparently relied on the improper conclusion that are limiting or individual to simple tasks equated with unskilled work." P. Br. at 13. As best the court can determine, LeCoq is contending that the ALJ apparently relied on an improper conclusion that limiting someone

---

[7]Although LeCoq attempts to challenge the ALJ's analysis at step five in other ways, each fails for the reasons given *infra* at § III(C)(1) and (2) and § IV.

to simple tasks equates with the ability to perform unskilled work. LeCoq has not shown reversible error on either basis.

                                    1

     Turning first to the issue of dealing with the public, the court recognizes that,

> [u]nless the hypothetical question posed to the [VE] by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question), a determination of non-disability based on such a defective question cannot stand.

*Bowling*, 36 F.3d at 436.  Nevertheless, it is the ALJ who has the duty to determine, based on the totality of the evidence, which disabilities should be recognized.  The ALJ's decision in this case does not indicate that he found that LeCoq was limited in dealing with the public.  *Cf. id.* at 436-47 (finding reversible error where hypothetical stated that plaintiff's kidney problem had been resolved, but ALJ also found that plaintiff had severe kidney problems and evidence supported finding of severe problems, and ALJ misrepresented actual condition of plaintiff's kidneys when posing hypothetical to VE).  And there is substantial evidence to support a conclusion that LeCoq was not unduly limited in her ability to deal with the public.

                                  - 20 -

In his June 22, 1994 assessment, Dr. McCormick found that
LeCoq was not significantly limited in her ability to interact
appropriately with the general public.  R. 70.  Addressing the
topic of social functioning in his February 6, 1995 report, an
examining physician, Brian Espinoza, M.D. ("Dr. Espinoza"), noted
that, although LeCoq reported that she did not like to do anything
at that time, she was "taking some classes at Eastfield Community
College."  R. 371.  Another examining physician, Daniel B. Pearson,
III, M.D. ("Dr. Pearson"), concluded on October 10, 1995 that LeCoq
had "some difficulty in social and occupational functioning, but
[was] generally functioning pretty well and has some meaningful
interpersonal relationships."  R. 377.  The assessment of Dr.
McCormick and the evidence from Drs. Espinoza and Pearson provide
substantial evidence—i.e., more than a scintilla—to support a
conclusion that LeCoq was not unduly limited in dealing with the
public.  Because LeCoq has not shown that the ALJ failed to
incorporate reasonably in the hypothetical all of LeCoq's
disabilities that the ALJ recognized, she has not established
reversible error.  *See, e.g., Capers v. Barnhart*, No.
3:03-CV-0693-D, slip op. at 16 (N.D. Tex. Feb. 3, 2004) (Fitzwater,
J.) ("Because the hypothetical question that the ALJ posed to the
VE contained all the limitations the ALJ found, and since the court
has held that substantial evidence supports the ALJ's conclusion
that only these limitations apply, the VE's testimony formed a

proper basis for the ALJ's conclusion that [plaintiff] is not disabled under the Act." (footnote omitted)).

2

LeCoq has also failed to show reversible error based on the contention that the ALJ apparently relied on the improper conclusion that limiting an individual to simple tasks equates with the ability to perform unskilled work.  She asserts that the jobs on which the ALJ relied——cashier, ticket taker, and semi-skilled security guard——each requires the ability to deal with people and a reasoning level of 2 or above, whereas the Dictionary of Occupational Titles ("DOT") says that jobs involving only simple tasks are defined as requiring a reasoning level of 1.  LeCoq maintains that the ALJ cannot rely on vocational testimony that is at odds with the DOT without providing an explanation.  She argues that, because the ALJ did not ascertain the reasoning level of the alternative jobs, the fact that the hypothetical was restricted to simple tasks does not cure the flaw in the ALJ's decision.  She also posits that, had the ALJ properly taken into account her documented mental problems, there is a reasonable probability that the alternative jobs would have been precluded.  Although LeCoq's argument is not well developed, she appears to be contending that the ALJ erroneously found that she could perform three jobs for which she did not have the required level of reasoning and that required the ability to deal with people.

Concerning her ability to reason, the court concludes that her argument is insufficient to demonstrate reversible error. LeCoq's argument assumes that the ALJ found that she was limited to performing simple tasks. The ALJ, however, made no such finding in his decision. Rather, as the court explained *supra* at § III(B)(1), the ALJ explicitly recognized during the hearing, and implicitly found in his decision, that LeCoq met the requirements for performing unskilled work. The court concluded that there was substantial evidence to support such a finding.

Regarding the requirement that she have the ability to deal with people, as discussed *supra* at § III(C)(1), substantial evidence supports a conclusion that LeCoq was not unduly limited in her ability to deal with the public. Therefore, her argument that the jobs on which the ALJ relied require the ability to deal with the public cannot serve as an adequate basis to disturb the Commissioner's decision.

IV

LeCoq contends the ALJ's findings concerning her manipulative limitations are not consistent with the entire testimony of the ME on which the ALJ said he relied.

LeCoq asserts that, although Dr. Freeman first testified that her hand impairment limited her ability to use her hand for both repetitive and fine motions, he opined on cross-examination that she could only occasionally, but not repetitively, engage in gross

- 23 -

hand use, such as handling and grasping.  LeCoq argues that the ALJ
ignored this part of Dr. Freeman's testimony.  She contends this
flaw was not cured by the VE's testimony, in which she responded to
questions that asked her to consider no repetitive use of the hands
and no constant fine fingering.  Based on the DOT definitions of
"occasional" (i.e., up to one-third of the time) and "repetitive"
(i.e., more than two-thirds of the time), she maintains that Dr.
Freeman's testimony means that she could only use her hands for
gross manipulation for up to one-third of the workday, but the DOT
provides that the jobs of cashier, ticket taker, and security guard
require frequent handling.  She also contends that on cross-
examination the VE testified that the jobs of cashier and ticket
taker would have been precluded if the ability to use her hands was
restricted to less than occasional.  LeCoq posits that, had the ALJ
posed a hypothetical to the VE that reflected the precise physical
limitations to which Dr. Freeman testified, and included the mental
limitations established in the record, the VE may have excluded all
the alternative jobs cited.  LeCoq maintains that the Commissioner
did not meet her burden of proof at step five.

    Dr. Freeman testified on cross-examination that, concerning
gross hand use, LeCoq's physical impairments limited her to
"occasional, but not repetitive" handling and large grasping.  R.
505-06.  When presenting this evidence to the VE in his
hypothetical, the ALJ did not specifically mention LeCoq's

restriction to "occasional" use, but he did state that she was precluded from repetitive use of her hands. R. 512.  In response, the VE excluded jobs that required repetitive use, indicating that unskilled cashiering positions in "less busy environments" (e.g. check cashing center and "taking money and giving out tickets" at movie theaters) and unskilled security guard (those who do not carry weapons and generally work in environments like office buildings) would be available.  *See* R. 512-14.

On cross-examination, the VE stated that she was addressing fine finger manipulation, handling and grasping objects, and overhead reaching limited to occasionally. R. 514-15.  The VE testified that the jobs she mentioned were viable based on these limitations. R. 515.  She confirmed that these jobs numbered 40,000 sedentary and 200,000 light in Texas, of which (conservatively) 20% to 25% existed in the North Texas region. R. 515.  She opined that, if the limit on LeCoq's ability to use her hands for fine and gross manipulation was restricted to less than occasional, this would affect her ability to perform the cashiering jobs but not significantly limit the security guard position. R. 517.

LeCoq has failed to demonstrate reversible error.  Although the hypothetical did not specify the limitation of occasional handling, the VE made clear during cross-examination that each of the jobs she cited could be performed by someone restricted to

- 25 -

occasional handling.   Thus her testimony is consistent with the limitations of handling to which Dr. Freeman testified, and LeCoq cannot show that she was prejudiced by the ALJ's hypothetical. Moreover, the VE explained that, even if LeCoq's abilities were reduced below the level indicated by Dr. Freeman's testimony to work with less than occasional handling, there would still remain, at the sedentary level, 12,000 security jobs in Texas and 200,000 such jobs in the United States that she could perform, and 23,000 jobs in Texas and 332,000 in the United States at the light level. *See* R. 518.   The record evidence therefore supports the ALJ's finding that the Commissioner met her burden of proof at step five.[8]

*          *          *

For the reasons set forth, LeCoq has failed to establish that the ALJ committed reversible error.   The decision of the Commissioner is therefore AFFIRMED.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[8]In her reply brief, LeCoq also appears to contend that, under SSR 00-4p, the ALJ was obligated to inquire affirmatively about conflicts between the VE's testimony and the DOT, and that he was permitted to rely on contrary VE testimony only where there was a reasonable explanation given for the conflict.   This argument is one that LeCoq raises for the first time in her reply brief as to the issue of handling or grasping objects, and the court declines to consider it.   *See supra* note 1.